UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| SUSANNAH HUNT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:20-CV-00321-LEW |
| | ) | |
| TODDLE INN DAYCARE INC., | ) | |
| | ) | |
| Defendant | ) | |

**ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S SPOLIATION MOTION**

Susannah Hunt, Plaintiff, alleges in her First Amended Complaint (ECF No. 10) that her former employer, Toddle Inn Daycare Inc., Defendant, subjected her to harassment and other disparate treatment based on race.

Defendant filed its Motion for Summary Judgment (ECF No. 26) on April 9, 2021. Plaintiff filed her "Spoliation Motion to Strike Testimony" (ECF No. 32) on April 30, 2021.

**SUMMARY JUDGMENT FACTS**

The following statement recites the disputed facts in the light most favorable to Plaintiff Susannah Hunt.

Defendant Toddle Inn Daycare ("Toddle") is a corporate entity headquartered in Scarborough and operates six childcare centers in Southern Maine. Each center has a director and assistant director who perform on-site operations management, including employee supervision. These on-site management functions are overseen by staff at the

1

company headquarters, where upper level managers and staff perform operational, administrative, and human resource functions on a company-wide basis.

Susannah Hunt is an African American woman. She went to work for Toddle as a full-time employee in September 2017 at its Westbrook childcare center. Her starting position was known as a "floater."

At all times relevant, Raelene Bodman was the director of the Westbrook center. The center also had an assistant director. In 2017 and through a part of 2018, the assistant director was Lindsay Vrabel. Sometime in 2018 – not later than November – and continuing through the rest of Hunt's employment, the assistant director was Monique Beaulieu.

When Ms. Hunt started she signed a document ("Dear Staff" letter, Def.'s Ex. 6) advising that "[i]f at any time" a staff member felt the need to speak with someone "about concerns relating to [their] job such as co-workers, scheduling, etc." they were to "use the chain of command to report [their] concerns." This document also advised staff members to "talk to [their] management team first" but if their "concerns were not addressed/handled to [their] satisfaction" to contact Danielle Foley, Toddle's District Manager/HR. If staff members still felt they needed to speak with someone regarding their concerns they were to contact Beth LaSalle, Toddle's Personnel Director. Finally, if concerns still were not addressed, staff members were advised to contact Cheryl Carrier, Toddle's owner. Telephone numbers and email addresses were provided for on-site managers, as well as for Foley, LaSalle, and Carrier.

Ms. Hunt also received a copy of Toddle Inn Child Care Center's Employee Policies and Guidelines (Def.'s Ex. 5), which she reviewed during her employment. She also attended a new hire orientation at which Toddle's policies and guidelines were reviewed, including its anti-discrimination and anti-harassment policies. Hunt reviewed the same, initialed each page, and signed an acknowledgment indicating that she read and understood them.

Among Toddle's policies is an equal employment policy. It states:

Discrimination against employees and applicants due to race, color, religion, sex (including sexual harassment), marital status, sexual orientation, national origin, ancestry, physical or mental disability, age, military, or veteran status, or any other status or characteristic protected by law, is prohibited. Employees who violate this policy will be subject to discipline, up to and including termination.

The document also states:

Harassment, discrimination, and retaliation of, or by, employees, vendors, visitors, customers, and clients is unlawful. Toddle Inn prohibits these forms of offensive conduct, regardless of whether they are motivated by gender, race, color, nation origin, ancestry, religion, sexual orientation, age, marital status, physical or mental disability, military or veteran status, or any other status or characteristic protected by law. If you feel you are being harassed or subject to discrimination or retaliation, in any manner, because of your race, color, national origin, ancestry, religion, gender, sexual orientation, age, marital status, physical or mental disability, military or veteran status, or any other protected status or characteristic protected by law you are encouraged to report and follow the complaint procedure ….

Id.

In terms of procedures, the policy instructed "[a]ny employee who believes he or she has been discriminated against [to] immediately report any incidents to Human Resources" and stated that "Toddle Inn will not tolerate retaliation against any employee

who reports acts of discrimination or provides information in connection with any such complaint." *Id.* The policy further stated that any questions should be directed to Cheryl Carrier and provided an email address for Ms. Carrier.

Toddle Inn's Employee Policies and Guidelines address discipline, and state: "[w]hen appropriate, progressive discipline will be used to enforce the disciplinary policy." Def.'s Ex. 5. Employees are first to receive a verbal warning where they are "advised of the problem and how it can be corrected." *Id.* This is documented with a "written memo as to when the verbal warning took place, and for what reason." *Id.* If a verbal warning does not resolve the problem, the next step under the policy is to use a written warning. Finally, the employee may be terminated if the written warning does not solve the problem.

At her four-week review, Ms. Hunt received positive feedback from Ms. Bodman, including praise that she had "done an amazing job" and was "a great addition to [the] family." Shortly thereafter, in November, 2017, Ms. Hunt received an increase in pay from $11.50 per hour to $11.75 per hour.

Early in her tenure with Toddle, Ms. Hunt listened to a co-worker make an offensive statement outside of the workplace. According to Hunt – the account was disputed by the person in question – the co-worker stated that she has a brother with big lips and her family teases him and jokes that his mother must have "slept with a [N-word]." Although Hunt made a point of telling the individual not to use the word due to its offensive nature, Hunt did not report the incident to a supervisor at the Westbrook center or anyone else in management at Toddle. Because there is no evidence that any manager at Toddle was aware

4

of the incident, let alone evidence that it was even a workplace incident, Hunt's case is not supported by the incident.

The first incident that management had to consider occurred in January of 2018 and involved a "communication issue" between Ms. Hunt and one of her co-workers (not the above-mentioned individual). Ms. Bodman oversaw a meeting between the two employees to attempt a resolution. At her deposition, Ms. Hunt agreed that the meeting was an effective means of confronting the issue and finding a path forward. Nothing in the record suggests that this initial workplace incident had anything to do with the issue of race.

*The "harassment" incident*

Later that month, on January 23, 2018, Ms. Hunt received a stern verbal warning (memorialized in her file) after a co-worker complained to management and stated she was thinking about quitting because Hunt texted her multiple times, came in early to return a gift to her classroom, approached her in the hallway at work to discuss non-work-related issues, and told her that she would meet her in the parking lot after work (Def's Ex. 10). There is no evidence that the issue between the women had anything to do with race. In the paper account that went into Ms. Hunt's file, Ms. Bodman wrote that the other employee described Hunt's behavior as "harassment." Hunt believes this characterization betrayed racial bias because she does not believe the other employee would have used the word harassment and she feels it plays into a stereotype about people with her skin color being aggressive.

Ms. Hunt never expressed her viewpoint at the time so that the matter might be addressed then and there. Furthermore, neither party relies on a declaration or testimony

by the co-worker in question. What can be gleaned from the record is simply that the co-worker was sufficiently upset by Hunt's conduct to bring the matter to management. Eventually, Hunt and her co-worker worked things out and, in April 2018, they notified Ms. Bodman of the fact. Bodman told Hunt she would update Hunt's file to reflect the same, but she failed to do so.

Ms. Hunt opines that the write up was a racially biased mischaracterization placed in her file by Ms. Bodman. Hunt testified at her deposition both that she "feels" that the coworker would not have phrased her complaints in the way Bodman wrote it and that the woman told her she had not put it in that way. Hunt Dep. at 214. Ms. Hunt's proposed additions to the record related to what the co-worker told her succumb to the hearsay rule and, therefore, do not support an inferential finding that Ms. Bodman falsely characterized the woman's complaints.[1] In any event, Ms. Hunt has conceded that the underlying conduct occurred and she does not suggest that it was improper to warn her not to repeat the conduct. Ms. Hunt otherwise relies on a subjective critique of the term harass, opining that the term does not fit for two co-workers trying to work out an issue involving an aspect of their off-work relationship and suggesting that the term reflects racial animus. However, and again, Hunt signed the note memorializing the warning without offering any of these critiques at the time.

After the January incident, Ms. Hunt emailed the corporate office to request an assignment to a different Toddle center, but her request was not honored and was shared

---

[1] Defendant presses the hearsay objection in opposition to Plaintiff's characterization of what her co-worker said. Reply Statement ¶ 8.

with her Westbrook supervisors. According to Ms. Hunt, the fact that her request was shared with her local supervisors "broke" her trust in the corporate office.  Pl.'s Statement ¶ 12.

Meanwhile, in February 2018, Ms. Hunt was spoken to about appropriate use of "pack and plays,"[2] including that pack and plays not be used for time outs. Hunt was also spoken to about use of appropriate language. Hunt explained that she was still learning and was overwhelmed by children who were biting. At her deposition, she testified that the counseling she received on these issues was valid and appropriate. The following week, Hunt received a disciplinary action for continuing to use pack and plays in a manner that was inconsistent with Toddle's positive guidance/redirection policy. She was also observed strapping a child into a chair for 23 minutes with no toys after a biting incident. Hunt admits this was an appropriate subject of written discipline and states that she was not singled out because her co-worker also received discipline.

Regardless of these incidents, which evidently reflect the basic realities of early-age childcare in a group setting with one or two teachers per classroom, Ms. Bodman promoted Ms. Hunt to a "lead" position in February of 2018. Hunt explained that she was approached by Bodman about this opportunity because she "was doing so well in the infant room" and because she was "such a strong positive force." Hunt Dep. at 149. [3]

---

[2] Pack and plays are portable, collapsible playpens that can be used to corral small children.

[3] On March 21, 2018, Hunt (and three other teachers on duty that day) received a disciplinary action after an incident where two children were left in the hallway for twelve minutes. Hunt agreed at her deposition that this was an appropriate matter to document in an employee's personnel file.

*The mole incident*

In November of 2018, more than a year after coming to work for Toddle, Ms. Hunt made her first report of a race-related incident to Ms. Bodman. Specifically, one of Ms. Hunt's co-workers (presumably Caucasion), while overseeing an activity of placing storybook character pictures on a refrigerator in the classroom, observed that the picture of the mole character was missing and said to Ms. Hunt, "What about your face?" Ms. Hunt reported the incident to Monique Beaulieu, Toddle's new assistant director in Westbrook, who, the parties advise, is African American.[4] Ms. Beaulieu then informed Ms. Bodman, who summoned the co-worker to her office to discuss the matter in the presence of Ms. Beaulieu and Ms. Hunt. The co-worker apologized and received a verbal warning. During the meeting, Ms. Beaulieu advised the co-worker that it was not appropriate to make remarks related to someone's skin color and she prepared a written note memorializing the meeting that was placed in the woman's personnel file. During the meeting, the co-worker expressed the opinion that she was not racist and stated that she considered a certain boy of Indian descent to be like her second son. Ms. Beaulieu, addressing the group at one point, made a remark about "choosing your battles" and not "fighting every single little thing." The parties cite Ms. Bodman's testimony in support of this fact (deposition page 70) rather than Ms. Beaulieu's.

After the meeting, Ms. Hunt had no further trouble with the co-worker who made the mole comment. However, Hunt had been shocked by what her co-worker said. She

---

[4] Ms. Hunt noted in her deposition testimony that her skin tone is darker than Ms. Beaulieu's and "guessed" that Beaulieu "doesn't identify as black." Hunt Dep. at 196. Beaulieu stated in her deposition testimony that Hunt was "high maintenance." Beaulieu Dep. at 13.

drew a parallel between the dark color of the mole character and her own skin color and she perceived her co-worker's comment to be insensitive or racist for this reason. Though Hunt perceived the comment as indicative of racism, Ms. Bodman testified that she did not understand the comment to be racist necessarily. The co-worker who was counseled during the meeting was deposed. At her deposition she testified that she did not think she had been formally disciplined and that it was her understanding that Bodman wanted her to consider her audience and to be professional and respectful at all times.

*The "black name" incident*

In December of 2018, Ms. Hunt reported another race-related incident to Ms. Bodman. This incident involved yet another co-worker (C.M.) who purportedly misquoted Hunt's daughter (who attended the center as a student). According to Hunt, whose version, though disputed, is credited here, C.M. called her on the phone to share that Hunt's daughter said she (the daughter) has a "black name." Hunt Dep. at 164-165. Later, passing in the hallway, C.M. once more told Hunt that her child said she has a black name. This time, the child overheard C.M. and said that C.M. was wrong and that what she said was that she has black hair.

Hunt told Bodman what C.M. had said to her. Bodman's immediate response was to suggest that Hunt talk to C.M. about it. Sometime afterward, Hunt saw Beaulieu and related the matter to her. When Bodman saw Hunt later in the day, she told Hunt that she should not have taken the matter to Beaulieu because Bodman had already told Hunt to work it out with C.M.  Hunt considered Bodman's reaction a form of "aggression." Hunt

Dep. at 174. Later that day or the next, Bodman and Beaulieu told Hunt they would look into the matter by reviewing video.

According to Ms, Bodman, who described the event during her deposition, her concern was whether C.M. had allowed or participated in inappropriate conduct in the classroom. For this reason, Bodman reviewed video of C.M.'s classroom to see what transpired and concluded that C.M. had not done anything inappropriate in the classroom. Bodman testified she did not attempt to review any video from the hallway camera to see what C.M. may have said to Hunt there or video from a classroom camera to see if C.M.'s side of the phone call could be overheard. When Bodman later informed Hunt what was on the classroom video, she confirmed the daughter's account that she had not said anything about a black name. Bodman described the scene that took place among the children as "quite funny really." Hunt Dep. at 173. This upset Hunt because regardless of the nature of the children's interaction, it was not a funny situation. When she expressed this to Bodman, Bodman "started getting an attitude." *Id.* at 174. The experience left Hunt feeling demeaned and unheard.

Following this investigation, Ms. Bodman did not issue C.M. a verbal or written warning or any other form of discipline and, evidently, hoped the matter would blow over. Ms. Hunt later spoke with Ms. Beaulieu about the incident and complained that she felt C.M. should have received discipline. According to Hunt, Beaulieu merely shrugged. After Hunt met with Beaulieu, Bodman called her into the office and told her she should not have gone to Beaulieu after the fact to complain about Bodman's treatment of the issue.

Asked at her deposition whether she felt Bodman and Beaulieu had responded appropriately, Hunt testified:

> I do to an extent. Like, yes, they did watch the video. Yes, they confirmed that [the daughter] said black hair. But I feel like was there accountability for [C.M.] as – you know, there's been, you know, write ups for myself with – with things that I've done wrong. I don't feel like they did that. I felt like it was just swept under the rug.

Hunt Dep. at 180. In Hunt's view, the investigation should have included an attempt to determine what C.M. said to her, not just what the children were saying in the classroom. To her, the real issue was what C.M. said because it was a form of bullying.

In January of 2019, Hunt received a pay increase from $11.75 to $12.25 per hour.

*Five-day schedule*

In March of 2019, Ms. Bodman received instructions from the corporate office to implement changes to the staff schedule to assign the teachers with one-teacher classrooms to work five-day shifts rather than four-day shifts. According to Bodman's testimony, the center was short staffed at the time. Bodman Dep. at 86-87. Ms. Hunt, who by that time worked in a one-teacher classroom, was subject to the new scheduling policy, just like seven or eight of her colleagues.[5] One employee less senior than Hunt was spared the five-day schedule because it would have disqualified the employee from participating in certain government assistance programs. Hunt complained about the change to Beaulieu. Hunt recounted the session at her deposition in the following terms:

---

[5] Ms. Bodman testified that Ms. Hunt and Ms. Beaulieu were the only African American employees. Bodman Dep. at 34. Hunt denies this statement of fact (Def.'s Statement ¶ 40) even though it is supported by record evidence. I credit the statement because Hunt offers nothing of substance to controvert it, effectively conceding the point.

> Q.     What happened after you discussed that with Monique?
>
> A.     I -- she understood my concerns, and she -- honestly I feel like she just -- she was still new, and she didn't really know where to go from there. She felt as though if she were to go higher up, that she might have – there would have been some repercussions for her for going higher up that would have, you know, gone on to her through working with Raelene still.

Hunt Dep. at 223-24. Hunt further testified that she did not challenge her five-day assignment with anyone above Ms. Bodman because she felt that there would be repercussions if she did, based on what she says Ms. Beaulieu said on the topic.

### *Hibachi incident*

At some point in the chronology, an employee at Toddle's Westbrook center invited staff to join her in celebrating her mother's birthday at a restaurant. Ms. Hunt has offered statements concerning the matter that are strong on rhetoric but abstract in terms of facts. As I have for some facts set out above, I will simply relate the cited deposition testimony, beginning with Hunt's:

> Q.     You mentioned something earlier about a Hibachi incident. What was that?
>
> A.     I believe it was Alex mom's birthday. We were all invited to go to Hibachi.  Emma and Dani couldn't make it. Do you want me to go in full detail of that night?
>
> Q.     Yeah. Well, let me ask a follow-up question. So this was an outside of work social thing that you went with some coworkers from work; is that right?
>
> A.     Correct.
>
> Q.     Okay. And was there anybody -- any of your -- apart from Emma and Dani, were there any other coworkers who were invited to that or did go to that?

A.      I believe there were several.

….

Q.      How many people went to it?

A.      I'm gauging maybe 12.

Q.      Was there anybody there that didn't work at Toddle Inn?

A.      Some people brought their spouses.

….

Q.      So what happened that night?

A.      Everything was going fine. We all were laughing and joking around, but then someone made a comment -- because everybody else had their entrees -- someone made a comment saying like, oh, they must not have -- oh, someone said, oh, why don't you have your food, and they were referring to another coworker. And she said, I don't know. Maybe it's because I'm vegan. And Dani and Emma, they are vegan. So I was just, like, okay, like, just sitting there thinking, like, okay, you could have used anything else to say but you chose to say that. I didn't think it was directed at them, per se. So I wouldn't of -- well, let me get to the end of the story, and then I'll go back to it.

        But -- so then everyone just kind of chuckled, and then I think someone made a comment to Raelene. And she goes, well, not me; I like my meat. And so I just -- I don't know. It just rubbed me the wrong way. So the next day I did talk to Emma about it because we were in a classroom together. I was, like, no one mentioned anyone's name or anything, but I just thought it was a little odd, just the little comments. And she did tell her wife about it, and they did mention that, like, you know – I didn't say specifically that people were targeting them or, like, used their name in any of it.

        And then we ended up -- at the end of the day we had a meeting in Raelene's office about the incident. And I was pretty much screamed at, and I was nothing but respectful when I was talking about it. And even Dani and Emma seconded what I was saying. And Raelene mentioned that somebody said, well, oh, you said people were saying their names and stuff like that. And even both Dani and Emma said that Susannah never said that to us, so that must have just got added in. And it just felt like Raelene didn't want to hear anything I had to say, and she continued to scream at me. And then I did raise my voice, and I said, you know what, I've gone through so much stuff here. This is absolutely ridiculous, and none of the times that I've been in the office and told you guys I never said that or this didn't happen you've ever

13

believed me. And Raelene pretty much just didn't want to hear it, and she said, well, if you don't want to work here, there's the door.

Hunt Dep. at 98-102.

Ms. Bodman's account follows:

Q      I want to ask you about an incident involving a dinner at Hibachi. Do you recall an incident?

A      Yeah.

Q      What do you know about that?

A      So there was a teacher who was leaving. She had only been here for about a year. She said, does anybody want to go out for Hibachi. Again, not a Toddle Inn sanctioned event or whatever, so some people went, some people didn't. It was pay on your own. It wasn't anything forced. And it wasn't anything at Hibachi. It was when we came back from Hibachi the next day that there was all this buzz around the whole building about Susannah going around and talking about something that somebody had said at the dinner and she was just talking to all kinds of different staff and staff did come to me that day. And at the end of the day, I had all of those people just come into the office and spoke to all of them about this is the stuff we have been talking about, this is where it gets stressful, like why are we making this big buzz the next day going around talking to people who weren't there telling them stuff -- like it didn't have anything to do with the pre-K teacher who wasn't there and that those were the things that made work stressful for everybody.

Q      What do you mean by buzz?

A      Like Susannah running around and doing what we talked about earlier, saying to this teacher, oh, you should have heard this comment that so and so made, and then that teacher came to me and said, I wasn't there, I don't care what that teacher said, why didn't she just talk to that teacher. And again, this wasn't a Toddle Inn scheduled event. It was like do you want to come to dinner, I'm leaving and going to take another job, come join us and go to dinner, pay on your own.

Q      So people came to you and said that Susannah was talking about --

A      Yes, the dinner.

14

Q        -- the dinner?

A        Whatever she had overheard at the dinner.
….

Q        But you said that people came to you in the workplace that were complaining about what was going on in the workplace?

A        Correct.

Q        That there was a buzz in the workplace. What was that?

A        They were just coming saying that Susannah came and talked to me about what was said at the dinner and I'm like –

Q        At the workplace?

A        Yes.

Q        And so when an employee at the workplace came to you at your workplace and said that Susannah was saying things in the workplace, did you look at the tapes?

A        I did not.

Q        Okay. You just took the word for it of the employee who came into your office?
….

A        The employees.

Q        You just took their word for it?
….

A        The employees, yes.

Q        Did you ask Susannah about it?

A        Yes, I do remember and she said somebody had made a comment about a couple of the girls being vegans.

Q      And what did she say about -- did you ask her if she was talking to a
bunch of different employees about it?

A      She said she was, yes.

Q      She said she was talking to other people at work about it?

A      And some of the other girls who the supposed comments were about
said that other people were coming to them as well.

Q      Other people were coming to them and saying what?

A      That Susannah was talking about comments made at a dinner that they
also did not attend.

….

Q      Did Susannah ever complain to you about the way she was treated
with regard to that situation?

A      No, and I wasn't singling her out, I was talking to the whole group of
them.

Bodman Dep. at 91-95.

*Surveillance*

Sometime in March of 2019, Ms. Beaulieu approached Ms. Hunt at Ms. Bodman's

request to ask what Ms. Hunt was talking to another coworker about in the parking lot.

Beaulieu's inquiry revealed that Bodman had observed the parking lot talk by means of a

video camera. Hunt asked Beaulieu why she was being monitored like "an inmate." Hunt

also asked whether Bodman ever asked Beaulieu to see what any other coworkers talked

about in the parking lot. Beaulieu denied being asked to make a similar inquiry of anyone

else. Hunt Dep. at 237, 251.

*We aren't babysitters*

Sometime in the spring of 2019 (according to the Amended Complaint), Hunt was criticized at a staff meeting for using the term "babysit." In Hunt's words:

> So we had a staff meeting, and they, Raelene and Monique, slash -- I forget her name. But she's been -- she was with the company for a while, too. It wasn't Donna. But she used to babysit this new hire, who was a boy, who came to work with us. And I just said, so you used to babysit him. And then everyone -- a couple people jumped down my throat. Pretty much one person said, oh, we don't sit on babies. And then Raelene commented, we aren't babysitters. We're early childhood educators, with a little attitude twang in her voice. And then it just was, you know, kind of taken as a joke. But then Donna stood up after me and was describing something and used incorrect grammar and said somewheres, but nobody tried to correct her for that, but yet I was corrected for saying babysitter as opposed to saying early childhood educator.

Hunt Dep. at 231-32.

*Moving on*

On April 29, 2019, Ms. Hunt texted Ms. Beaulieu and stated that she felt it was time to move on. Beaulieu encouraged Hunt to provide a two-week notice if she chose to leave. It was not the first time Hunt had raised the issue of leaving with Beaulieu. Beaulieu testified at her deposition that Hunt had suggested it several (eight to ten) times and that, at the beginning, Beaulieu had encouraged her to stay by asking what they could do to help her. Eventually, Beaulieu advised her to give notice before leaving, observing that Hunt had had good employment with Toddle. Hunt adds that in her discussions with Beaulieu she had also stated that she felt she did not have the opportunity for personal growth at Toddle because she felt that her character had been questioned.

On April 30, 2019, Hunt texted Beaulieu to call out from work. The following day, May 1, a Wednesday, she emailed her notice to Bodman and Beaulieu, stating she would

continue to work through May 10, a Friday. In the body of her email, Hunt wrote: "I thank you for the opportunity in working with this company, and having space so my daughter could be close. I feel as though I did not excel in personal growth in my time here. I have found a different path to my journey that I must proceed on." Def.'s Ex. 22. She did not complain of any unfair treatment, whether based on race or any other factor. Hunt did not report for work that day.

On May 2, 2019, Bodman notified Hunt by email that her resignation would be accepted effective immediately. Bodman testified at her deposition that she consulted with Toddle's main office and was advised[6] that because Hunt had called out two days in a row and had another unpaid day scheduled for May 3, it would be fine to let her go at that time due to concern whether her attendance would be reliable during the next week.[7] Bodman also advised Hunt that arrangements would be made so that she could pick up her daughter's things and a copy of her personnel file.

Some days later (evidently the following week), Hunt presented herself at the center to retrieve her things. Because she arrived during class time, she was not allowed to retrieve her belongings and someone else retrieved them for her to minimize class disruption. Hunt's daughter's papers had been removed from their binder and placed in a folder by her

---

[6] Plaintiff has not objected to this testimony, which after all was provided in response to her own counsel's questioning. Bodman Dep. at 102. Instead, she denies the assertion that she would have been unreliable in attendance. Hunt Dep. at 234. Whether the idea came from corporate or not, it is the non-discriminatory reason provided by Defendant for its handling of the matter.

[7] Under Toddle's policies, employees who voluntarily resign are "asked to provide at least a two weeks' notice" but Toddle "reserves the right to determine whether the employee will be allowed to work the 2[] weeks, or whether the separation should occur sooner." Def.'s Ex. 5.

teacher. Hunt was offended that the papers were removed from the binder. Later that day,[8] Hunt placed a call to the corporate office because she wanted to have a conversation with corporate management about the way she had been treated. She told the person who answered the phone that she "really needed to talk to someone in corporate," asking for either Danielle or Heather. She was told they were not in that day and to try again tomorrow. Hunt called back the next day, to similar effect, but was told someone would call her back. Nobody called her back. When Hunt spoke with the person on the phone, she said the call was important but did not explain the reason for her call because she "didn't feel like it was anybody at that center's business." Hunt Dep. at 257.

## DISCUSSION

### A.     Plaintiff's Motion to Strike

In connection with her Response to Defendant's Statement of Material Facts, Ms. Hunt has filed a "Spoliation Motion to Strike Testimony" (ECF No. 32). Through the Motion Ms. Hunt seeks to strike from the summary judgment record Toddle's assertion that Ms. Bodman reviewed a DVR of what may have transpired in the classroom related to the "black name" incident, even though the testimony is consistent with the report of Hunt's daughter that she never said she had a "black name" and even though Hunt herself cites the testimony in support of her own additional fact statement paragraph 23. In her view, Toddle should have preserved the classroom recording (as well as recordings from other cameras) and the failure to do so should be viewed as a kind of admission that the content of the

---

[8] To determine the timing, I rely here on Ms. Hunt's testimony that she placed the first call the same day that she went to the center to collect her things and that she placed the call the week after giving her notice. Hunt Dep. at 254.

recordings was not favorable to Toddle's anticipated assertion of the "*Faragher-Ellerth*

Affirmative Defense." Spoliation Motion at 1, 11.

> The First Circuit has described the *Faragher-Ellerth* defense as follows:
>
> Under Title VII, an employer is subject to vicarious liability for … harassment by an employee's supervisor which does not constitute a tangible employment action. But the employer may prevail if it demonstrates a two-part affirmative defense: that its own actions to prevent and correct harassment were reasonable and that the employee's actions in seeking to avoid harm were not reasonable.

*Chaloult v. Interstate Brands Corp.*, 540 F.3d 64, 66 (1st Cir. 2008) (citing *Faragher v.

City of Boca Raton*, 524 U.S. 775, 807 (1998); *Burlington Indus.*, *Inc. v. Ellerth*, 524 U.S.

742, 765 (1998)). Evidently Ms. Hunt contends that the failure to conduct a more expansive

review of recordings was itself a form of supervisor harassment, since neither of the

underlying incidents involved misconduct by a supervisor. For purposes of summary

judgment, she apparently seeks to preclude any testimony about what may have appeared

on recordings and would like the Court to entertain, instead, an "adverse inference" remedy

associated with the alleged spoliation of evidence.

Concerning the mole incident, the employee in question admitted making the

statement. Given this context, I see no reason why it would have been necessary to review

a recording merely to confirm what Ms. Hunt asserted and the employee admitted. In any

event, there is no testimony to strike about reviewing recordings because there is no

testimony that a recording was reviewed.

Concerning the black name incident, both Bodman and Hunt assert in their

statements that Bodman reviewed a DVR recording that captured a child-led discussion

about hair color. Both parties agree that Bodman at least did that much to investigate Hunt's report. I, therefore, see no reason to preclude testimony to that effect. As for whatever else may have been ascertainable from the feed of that same camera or a hallway camera, Bodman would be permitted to testify that she did not attempt to find out, just as Hunt and her counsel would be able to ask her why she limited her investigation. But Bodman's failure to investigate whether she could overhear a phone call or hallway remark does not involve a representation about the content of a video recording; it simply is a representation that she limited her investigation to what transpired with the children in the classroom. I am not persuaded that that kind of testimony should be precluded or that a spoliation instruction / adverse inference is warranted given this presentation.

Finally, the standard that applies for a spoliation instruction also does not support relief in this case. Under the circumstances known to Bodman at the time (drawn from the summary judgment record), I do not agree with Hunt that Bodman or anyone else should have anticipated a lawsuit against Toddle based on either or both incidents. Bodman would have understood that Hunt was upset by the perceived lack of sensitivity on the part of her co-workers, but a reasonable person in her position would not have jumped to the conclusion that Toddle, the employer, had thereby discriminated against Hunt by allowing a co-worker to abuse her. Consequently, I do not find any basis in the record to conclude that Toddle should have recognized the need to preserve evidence.[9] Because there is no

---

[9] The record reflects that Toddle's security camera hardware, a DVR system, overwrites itself approximately every 30 days. Def.'s Opp'n to Pl.'s Spoliation Mot. at 4 (ECF No. 37). The incidents in question occurred in November and December of 2018. Ms. Hunt gave her notice on May 1, 2019. Hunt's counsel requested that Toddle preserve electronic documentation by letter dated July 18, 2019, addressed to Ms. Bodman at the Westbrook facility, evidently counsel's first communication with Toddle concerning litigation.

basis in the record for me to conclude that Bodman or anyone else at Toddle acted negligently toward a serious evidentiary concern of which they were aware, let alone with actual intent to deprive Hunt of evidence, Plaintiff's request for a spoliation instruction is denied. *See*, *generally*, Fed. R. Evid. 37(e)(2) and Advisory Committee Note to subsection (e)(1) and (e)(2) (2015 Amendment).[10]

## B.   Defendant's Motion for Summary Judgment

In six counts,[11] Susannah Hunt advances two theories of relief: harassment (hostile work environment) and disparate treatment based on race. Concerning harassment, Toddle argues that Ms. Hunt's claims are not substantiated by the record because the incidents of which she complains were neither severe nor pervasive and because Toddle neither failed to address Hunt's concerns nor permitted Hunt's coworkers to engage in repeated acts demonstrating or suggestive of racial insensitivity. Concerning disparate treatment, Toddle argues Hunt's claims fall short because she cannot demonstrate that she suffered an adverse employment action, let alone that Toddle harbored or demonstrated a racial bias in its handling of any matter to which Hunt took offense.

---

[10] Hunt states in her reply memorandum in support of spoliation relief that she disagrees with the application of the standards recited in Rule 37(e). Plaintiff's Reply at 1, n.1 (ECF No. 41). However, she also observes that the Rule is itself premised on case law. *Id.*

[11] The counts set forth in Hunt's First Amended Complaint are as follows:

> Count I – alleged discrimination in the form of harassment/hostile work environment/constructive discharge in violation of the Maine Human Rights Act. *See* 5 M.R.S. §§ 4553(2), 4572, 4621.
> Count II – alleged disparate treatment in violation of the Maine Human Rights Act. *See id.*
> Counts III & IV – parallel claims alleging civil rights deprivations in violation of 42 U.S.C. § 1981.
> Count V & VI – parallel claims alleging violations of Title VII. *See* 42 U.S.C. §§ 2000e, 2000e-2, 2000e-5.

The parties apply the same legal standards to the claims despite the citation of different statutory regimes. I follow their lead in that regard.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). As cautioned by the Supreme Court, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby*, *Inc*., 477 U.S. 242, 247-48 (1986). A material fact is one that has the potential to determine the outcome of the litigation. *Id.* at 248; *Oahn Nguyen Chung v. StudentCity.com*, *Inc.*, 854 F.3d 97, 101 (1st Cir. 2017). To raise a genuine issue of material fact, the party opposing the summary judgment motion must demonstrate that the record contains evidence that would permit the finder of fact to resolve the material issues in her favor.  *See Triangle Trading Co. v. Robroy Indus*., *Inc.*, 200 F.3d 1, 2 (1st Cir. 1999).

### 1.  Harassment / Hostile Work Environment

In opposition to Toddle's Motion Hunt argues that the totality of the circumstances would support a verdict in her favor because, primarily, she was subjected to "three objectively and subjectively offensive racial statements that were made to her by her white co-workers," which incidents she describes as "flashpoints" that Toddle failed to correct, thereby causing "Hunt's entire work experience to be poisoned." Pl.'s Opp'n at 8 (ECF No. 30). The three flashpoints to which she refers are one co-worker's use of the N-word, another's suggestion that her picture could substitute for the picture of the mole character, and a third's claim that Hunt's daughter said she had a "black name." *Id.* at 8-11. Hunt also argues that Ms. Bodman engaged in harassment by not coming down hard on these co-

workers for their insensitive statements and by taking Hunt to task for going to Ms. Beaulieu to criticize Bodman's initial reaction to her report concerning the "black name" incident, which consisted in telling Hunt to work it out with C.M. *Id.* at 11.

In order to lay the groundwork for a favorable jury verdict at trial on a claim of race-based hostile work environment, a plaintiff must demonstrate the following: the experience of racial harassment, which harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive work environment, and a reasonable basis for imposing employer liability. *Garmon v. Nat'l R.R. Passenger Corp.*, 844 F.3d 307, 317 (1st Cir. 2016). For an employer to be found liable to an employee, the record must support a finding that the employer knew of and tolerated circumstances that altered the terms and conditions of the employment relationship. *Id.* To alter the terms and conditions of employment, the circumstances must be sufficiently serious to support a finding that they amounted to "severe or pervasive" discriminatory treatment viewed objectively; it is not enough (though it is necessary) that the circumstances were also perceived or internalized that way by the plaintiff. *Id. See also Douglas v. J.C. Penney Co.*, 474 F.3d 10, 15 (1st Cir. 2007); *O'Rourke v. City of Providence*, 235 F.3d 713, 728 (1st Cir. 2001). And when the "flashpoint," to borrow Hunt's term, is conduct on the part of co-workers, then generally "the plaintiff must show that the employer is liable either for creating or for tolerating [the resulting] atmosphere." *Wilson v. Moulison N. Corp.*, 639 F.3d 1, 7 (1st Cir. 2011). That is ordinarily achieved by presenting evidence "that the employer knew or should have known about the harassment yet failed to take prompt and appropriate remedial action." *Id.*

"[S]ummary judgment will lie when the undisputed facts show that a reasonable jury could not help but conclude that the employer's response was both timely and appropriate." *Id.*

When these standards are applied to the record in this case, no reasonable jury could return a verdict in favor of Ms. Hunt on her hostile work environment claim because the circumstances brought to the attention of Hunt's supervisors[12] were not indicative of a pervasively abusive work environment and, assuming for the sake of argument that the mole incident and the black name incident were both so objectively severe that they could be considered something worse than "isolated incidents,"[13] they were addressed by Ms. Bodman and Ms. Beaulieu, and the alleged offenders, who had never before displayed insensitivity, never again engaged in any offensive conduct. Succinctly stated, although the supervisory reaction to Ms. Hunt's reports was neither overtly inquisitorial nor disciplinarian in nature, in both cases it evidently prevented any further incident with the employees in question and Plaintiff's evidence fails to raise a genuine issue of employer toleration of an abusive work environment. Finally, because the record does not raise a genuine issue in support of the hostile work environment claim, it likewise cannot support a finding of constructive discharge. *See Lee-Crespo v. Schering-Plough Del Caribe Inc.*,

---

[12] I have excluded from my discussion the unreported use of the N-word by an employee at an out-of-work social gathering because nothing in the record would justify holding Toddle responsible for failing to respond to an out-of-work incident Hunt never reported.

[13] "[I]solated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotation marks omitted). I do not take issue with Ms. Hunt's report of the incidents. Without question she was right to raise her concerns and object to the behavior she attributes to her co-workers. However, based on my review of the record, I also conclude that a reasonable jury could not characterize the two race-related incidents in question as "extremely serious" transgressions justifying employer liability in the absence of a stern disciplinary sanction where informal counseling occurred and the conduct was never repeated by the offending employee.

354 F.3d 34, 45 (1st Cir. 2003) (requiring "intolerable" working conditions, a standard that is more difficult to establish than the severe or pervasive standard that applied to a hostile work environment claim).[14]

## 2. Disparate Treatment

Ms. Hunt argues she was treated more severely when it came to disciplinary matters and that this double standard was a form of adverse employment action. Pl.'s Opp'n at 16. Specifically, she asserts that the stern warning she received about harassing a co-worker in the workplace far exceeded the managerial reaction to her two reports of racial insensitivity in the workplace by co-workers. *Id.* at 16-17. She also argues that her position is fortified by Ms. Bodman's failure to correct the record placed in her personnel file after Bodman learned that Hunt and the co-worker had mended fences. *Id.* In addition, Hunt lists the failure to keep her on a four-day schedule, denial of vacation time, excessive monitoring, and Bodman's expression of ire when she exclaimed, "There's the door!" *Id.* at 18.

---

[14] The First Circuit has summarized the constructive discharge standard as follows:

> Constructive discharge can be shown where a plaintiff's working conditions were "so onerous, abusive, or unpleasant that a reasonable person in [her] position would have felt compelled to resign." *Suárez v. Pueblo Int'l, Inc.*, 229 F.3d 49, 54 (1st Cir. 2000) (citing *Vega v. Kodak Caribbean, Ltd.*, 3 F.3d 476, 480 (1st Cir. 1993)). While "[i]t is not enough that a plaintiff suffered 'the ordinary slings and arrows that workers routinely encounter in a hard, cold world,'" *Lee–Crespo v. Schering–Plough Del Caribe, Inc.*, 354 F.3d 34, 45 (1st Cir. 2003) (quoting *Suárez*, 229 F.3d at 54), we have nevertheless cited with approval the Seventh Circuit's admonition that "[w]hen an employer acts in a manner so as to have communicated to a reasonable employee that she will be terminated, and the plaintiff employee resigns, the employer's conduct may amount to constructive discharge." *EEOC v. Univ. of Chicago Hosps.*, 276 F.3d 326, 332 (7th Cir. 2002); *see also Torrech-Hernández v. Gen. Elec. Co.*, 519 F.3d 41, 50–51 (1st Cir. 2008). In other words, "[a] person who is told repeatedly that [s]he is not wanted [and] has no future ... would not be acting unreasonably if he decided that to remain with this employer would necessarily be inconsistent with even a minimal sense of self-respect, and therefore intolerable." *Hunt v. City of Markham, Illinois*, 219 F.3d 649, 655 (7th Cir. 2000) (emphasis added).

*Rivera-Rivera v. Medina & Medina, Inc.*, 898 F.3d 77, 96–97 (1st Cir. 2018) (some citation omitted).

To justify a trial verdict in her favor, Ms. Hunt must be able to present evidence that she suffered "some objectively and materially adverse action" that Toddle imposed on her because of her race or because of her complaints of racially insensitive remarks made by her coworkers. *Bhatti v. Trustees of Boston Univ.*, 659 F.3d 64, 73 (1st Cir. 2011).

As for the incidents involving supervisory criticism, "criticism that carries with it no consequences is not materially adverse and therefore not actionable." *Id.* Given this standard, a jury could find that Hunt was subjected to unfair criticism and yet not return a verdict in her favor. I have in mind here the verbal warning a supervisor gave her concerning her interactions with one employee (and Bodman's subsequent failure to modify the note in Hunt's file), the "if you don't want to work here, there's the door" statement, and the overwrought concern about what was transpiring in the parking lot. However, given the legal standard that governs employer liability, the jury could not impose liability on Toddle based on these criticisms "because none carried with it any tangible consequences." *Id.*

The matters that remain are the change in Hunt's schedule and the initial denial but eventual grant of her vacation request. While these kinds of concerns relate to tangible conditions of employment, still the record does not suggest that Hunt was singled out for less favorable treatment than her white coworkers. Seven or eight of Hunt's white colleagues were likewise changed to a five-day schedule. Also, the vacation time Hunt wanted she ultimately received. Thus, there is no basis in the record for a jury to compensate Hunt in damages for any materially adverse employment action.

Finally, there is the matter of Hunt's resignation, which involved Toddle's determination that she not serve out her notice period and the subsequent failure of personnel at the corporate headquarters to engage with Hunt after she resigned from employment. As to the first issue, the record establishes that Hunt gave a truncated notice, did not suggest in her notice that her decision was motivated by perceived injustices in the workplace, took leave on the two days leading into her notice period, and had another day of planned absence inside the notice period. Although Hunt asserts that she could have substantiated the unauthorized absences with doctor's notes, there is no evidence that she made that representation at the time. Furthermore, Toddle acted within its rights when it relieved Hunt of the expectation that she honor her notice period. After all, Hunt's notice made no mention of her belief that she was the victim of discrimination in the workplace. Had she expressed her belief and had Toddle acted in the same fashion, then a jury might infer that the decision was a reaction to protected activity, but instead the record presents an eminently reasonable justification for Toddle's decision and nothing to suggest that the decision was a pretext for discrimination based on race.

Finally, Hunt maintains that Toddle should have been receptive to her attempt to communicate after she resigned, based on her nonspecific phone calls to the corporate office that included no mention of perceived discriminatory treatment. Plaintiff has not made me aware of any precedent in which it was determined that the statutes that give rise to Hunt's claims impose a legal obligation on employers to institute exit-interview procedures for employees to air grievances. Nor, in my view, would it be appropriate for me to issue such a ruling here, given that trial courts are customarily limited to the law and

28

record as they exist.  The employment history in this particular case does not support a finding of a hostile work environment or the imposition of some other materially adverse employment action prior to Hunt's voluntary resignation.

### 3.  Summary Judgment Conclusion

When viewed in the light most favorable to Plaintiff Susannah Hunt, the summary judgment record may permit a jury to find that she experienced two racially insensitive encounters in the workplace involving coworkers. The record may also permit the jury to find that Plaintiff experienced unfair criticism during the course of her employment. However, the record would not permit the jury to find that Plaintiff's supervisors created, enabled, or tolerated a severely or pervasively "abusive" work environment or subjected her to any materially adverse employment action based on race. Consequently, Defendant's Motion for Summary Judgment is granted.

CONCLUSION

For the reasons set out in Discussion Section A, Plaintiff's Spoliation Motion to Strike Testimony (ECF No. 32) is **DENIED**. For the reasons set out in Discussion Section B, Defendant's Motion for Summary Judgment (ECF No. 26) is **GRANTED**. Judgment will enter for Defendant on all six counts of the First Amended Complaint.

**SO ORDERED.**

**Dated this 9th day of September, 2021.**

/s/ Lance E. Walker
UNITED STATES DISTRICT JUDGE